**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **TABATHA M. MOLINA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **UNITED STATES OF AMERICA,** | § | **SA-07-CV-0254 NN** |
| | § | |
| **Defendant.** | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The purpose of this order is to enter the court's findings of fact and conclusions of law following the trial of this case.[1] Plaintiff Tabatha M. Molina brought this case against defendant United States of America (the government), alleging medical negligence.[2] Mrs. Molina alleged that the government's employees, Dr. Neil McMullin and Dr. Thomas LeVoyer, were negligent performing a surgical procedure—a laparoscopic cholecystectomy[3]—causing her significant injury. After considering the evidence and applying Texas law, I conclude that Dr. McMullin and Dr. LeVoyer were not negligent in performing Mrs. Molina's surgery.

**FINDINGS OF FACT**

Sovereign immunity ordinarily insulates the government from suit, but the Federal Tort Claims Act provides for a limited waiver of sovereign immunity making the federal government liable "to the same extent as a private party for certain torts of federal employees acting within

---

[1]The trial was conducted from June 16, 2008 to June 18, 2008. I have jurisdiction to enter findings of fact and conclusions of law under 28 U.S.C. § 636(c) pursuant to the parties' consent. *See* docket entry # 7 & 8.

[2]*See* docket entry # 1.

[3]A "cholecystectomy" is a surgical procedure to remove the gallbladder. *See* J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 2-CH 848 (Matthew Bender 2005).

the scope of their employment."[4] Dr. McMullin—an U.S. Army surgical resident—and Dr. LeVoyer—a U.S. Army staff surgeon—are federal employees and acted within the scope of their employment in performing Mrs. Molina's surgery. The extent of the government's liability for the surgeons' actions is determined by reference to state law.[5] Because the surgery occurred at Brooke Army Medical Center (BAMC) in San Antonio, Texas law applies.

To prove medical negligence in Texas, "the plaintiff has the burden of proving (1) a duty by the physician or hospital to act according to an applicable standard of care; (2) a breach of that standard of care; (3) an injury, and (4) a causal connection between the breach of care and the injury."[6] There is no dispute that Dr. McMullin and Dr. LeVoyer owed Mrs. Molina a duty of care, or that Mrs. Molina suffered a significant injury. During her surgery, Mrs. Molina's common bile duct and common hepatic duct were dissected. The injury—a life-threatening injury— required a major repair surgery and two follow-on surgeries to repair hernias. All agree that the injury caused Mrs. Molina pain and suffering, with potential long-term complications to her health affecting her enjoyment of life. Despite the injury and the resulting damages, the only element of Mrs. Molina's case that is in dispute is the standard of care—specifically, whether Dr. McMullin and Dr. Levoyer breached the standard of care.

"A physician has a duty to render care to a patient with the degree of ordinary prudence and skill exercised by physicians of similar training and experience in the same or similar

---

[4] *United States v. Orleans*, 425 U.S. 807, 813 (1976).

[5] *See Molzof v. United States*, 502 U.S. 301, 305 (1992).

[6] *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003).

community under the same or similar circumstances."[7] "The medical standard of care is the threshold issue that a plaintiff must establish before the fact finder determines if the defendant deviated from the standard of care to a degree that constitutes negligence."[8] "As a general rule, expert testimony is required to establish the governing standard of care and to determine whether the standard has been breached."[9]

Mrs. Molina presented expert testimony to establish her theory of the standard of care. According to Mrs. Molina's expert—Dr. Clay Skinner—Dr. McMullin and Dr. Levoyer injured Mrs. Molina's common bile duct[10] and common hepatic duct because they did not comply with the standard of care for performing laparoscopic cholecystectomies. Dr. Skinner testified that the standard of care requires a surgeon to perform a laparoscopic cholecystectomy in a manner that does not injure the common bile duct and common hepatic duct. Dr. Skinner explained that the standard of care requires a surgeon to adequately skeletonize the ductal structures of the triangle of Calot[11] in order to accurately identify the structures and avoid injury to the adjacent common bile duct and common hepatic duct. Dr Skinner stated that the standard of cares requires the

---

[7]*Hollis v. United States*, 323 F.3d 330, 336 (5th Cir. 2003).

[8]*Mills v. Angel*, 995 S.W.2d 262, 268 (Tex. App.—Texarkana 1999, no pet.).

[9]*Mills*, 995 S.W.2d at 268.

[10]"The common bile duct is formed by the natural junction of two other bile ducts, the hepatic duct (which carries bile from the liver) and the cystic duct (which carries bile to and from the gallbladder)." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 2-CH 915 (Matthew Bender 2005).

[11]The triangle of Calot is a "triangular region marked off by the cystic duct (the duct conveying bile from the gallbladder), the hepatic duct (the duct conveying bile from the liver), and the substance of the liver. The cystic artery is usually located in this triangular region." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 2-CH 8066 (Matthew Bender 2005).

surgeon to provide appropriate retraction on the gallbladder throughout the procedure and to avoid causing excessive cephalad[12] retraction. Dr. Skinner opined that the standard of care requires surgeons to routinely use intraoperative cholangiography[13] to delineate the biliary anatomy in order to avoid injury to the adjacent bile duct and common hepatic duct. Dr. Skinner further testified that the standard of care requires the surgeon to recognize injury to the common bile duct and common hepatic duct intraoperatively and to repair the injury intraoperatively as indicated. Finally, Dr. Skinner opined that the standard of care requires a designated camera operator to hold the laparoscopic camera in lieu of the surgeon performing the laparoscopic cholecystectomy. The government disagrees with three aspects of Dr. Skinner's opinion: (1) The government disagrees that the standard of care requires a surgeon to use routine intraoperative cholangiography. (2) The government agrees with Dr. Skinner's opinion that the standard of care requires the surgeon to recognize injury to the common bile duct and common hepatic duct intraoperatively and to repair the injury intraoperatively, but only to the extent that injury to the common bile duct and common hepatic duct is recognizable intraoperatively and that repairing the injury intraoperatively will produce the best result for the patient. (3) The government disagrees that the standard of care requires a third person to hold the laparoscopic camera during cholecystectomies. Because a court's findings of fact must be sufficiently detailed

---

[12] "Cephalad" means "[t]oward the head; in the direction which leads to the head," as in towards the head of the gallbladder. J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 1-C 3383 (Matthew Bender 2005).

[13] A "cholangiogram" is an "x-ray picture of the bile ducts taken after the injection of a substance opaque to x-rays. The opaque substance makes the ducts stand out more clearly on the film." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 2-C 3796 (Matthew Bender 2005).

to show the factual basis for the court's ultimate conclusion,[14] the following discussion focuses the issues which form the basis of my conclusion that Dr. McMullin and Dr. LeVoyer did not breach the standard of care—the three aspects of disagreement about the standard of care.

In regard to the first disagreement—the required frequency of intraoperative cholangiography—Dr. Skinner explained that routine intraoperative cholangiography minimizes the risk of common bile duct injury because the procedure enables the surgeon to accurately identify biliary duct structures.[15] Dr. Skinner relied on the following opinions: (1) Dr. Frederick L. Greene's opinion that the "routine application of operative cholangiography following the identification of the cystic duct may lead to more definitive recognition of the extrahepatic biliary anatomy and may lessen the opportunity of injury to the system;"[16] (2) Dr. R. Flum's conclusion that the rate of common bile duct injury is significantly lower when intraoperative cholangiogram is used;[17] and (3) Dr. Gerald M. Fried's opinion that "one of the main advantages of

---

[14]*S. S. Silberblatt v. United States for Use & Benefit of Lambert Corp.*, 353 F.2d 545, 549 (5th Cir. 1965).

[15]The biliary structures refer to the human body's "organs and parts concerned with the secretion, conveyance, storage, and injection of bile (into the intestine), as the liver, bile ducts, gallbladder, etc." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 1-B 2156 (Matthew Bender 2005).

[16]Donald G. McQuarrie, M.D., Ph.D, Edward W. Humphrey, M.D., Ph.D. & James T. Lee, M.D., Ph.D., F.A.C.S., Reoperative Gen. Surgery, (2d ed.), ch. 24, Frederick L. Green, M.D., *Reoperations after Laparoscopic Surgery: Problems & their Mgmt.*, p. 509.

[17]David R. Flum, M.D., Thomas Koepssell, M.D., Patrick Heagerty, Ph.D., Mika Sinanan, M.D. & E. Patchen Dellinger, M.D.,ARCH SURG, *Common Bile Duct Injury During Laparoscopic Cholecystectomy & the Use of Intraoperative Cholangiography: Adverse Outcome or Preventable Error?*, Nov. 2001, vol. 136, p.1287.

cholangiography is that injuries can be recognized during the operation and promptly repaired."[18] If this were the only evidence about the use of intraoperative cholangiography, the evidence might indicate that Dr. McMullin and Dr. LeVoyer breached the standard of care because they did not perform an intraoperative cholangiogram before transecting what they thought was Mrs. Molina's cystic duct.[19] But the government presented evidence contradicting Dr. Skinner's opinion that the standard of care required an intraoperative cholangiogram.

The government's expert—Dr. David L. Gregg—testified that there are two schools of thought in the medical community in regard to intraoperative cholangiography. One school of thought calls for selective use of intraoperative cholangiography in performing cholecystectomies and the other school of thought requires routine use of intraoperative cholangiography. Dr. Gregg characterized the routine-intraoperative-cholangiography school of thought as the minor school of thought. He stated that 66% of surgeons use intraoperative cholangiography selectively because of the risks involved in the procedure. Dr. Skinner testified that Dr. McMullin and Dr. LeVoyer did not breach the standard of care by not performing an intraoperative cholangiogram because the triggers for intraoperative cholangiography—*e.g.*, a large cystic duct, common bile duct disease, lab work indicating gallstones in the bile duct, uncertainty identifying the biliary anatomy—were not present in Mrs. Molina's case. Dr. Gregg testified that the absence of intraoperative cholangiography has never been shown to prevent a common bile duct injury. He

---

[18]Douglas W. Wilmore, M.D., F.A.C.S., ACS Surgery: Principles & Prac., ch. 52, Gerald M. Fried, M.D. & Liane S. Feldman, M.D., *Laparoscopic Cholecystectomy*, p. 765.

[19]The cystic duct conveys bile to and from the gallbladder. J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 2-CH 8076 (Matthew Bender 2005). The cystic duct is dissected in a cholecystectomy as part of removing the gallbladder.

explained that a surgeon can easily misinterpret an operative cholangiogram in patients with an altered anatomy and a very short cystic duct. He opined that Mrs. Molina had a very small cystic duct, causing Dr. McMullin and Dr. LeVoyer to misidentify the common bile duct as the cystic duct and to misidentify an accessory hepatic duct as the common bile duct.

Dr. Gregg relied, in part, on an article by Dr. Lawrence Way to explain how the misidentification can occur.[20] In an article about the causes and prevention of laparoscopic bile duct injuries, Dr. Way reported his study of 252 laparoscopic bile duct injuries. Dr. Way reported that in class III injuries—the type of injury that Mrs. Molina suffered—the surgeon deliberately cut the common bile duct erroneously believing that the common bile duct was the cystic duct. He explained as follows:

> This stemmed from an illusion of object form due to specific uncommon configuration of the structures and the heuristic nature (unconscious assumptions) of human perception. . . . These data show that errors leading to laparoscopic bile duct injuries stem principally from misperception, not errors of skill, knowledge, or judgment. This misperception was so compelling that in most cases the surgeon did not recognize a problem.[21]

Dr. Way concluded that the primary cause of error in 97% of the studied cases was visual perceptual illusion.[22] Dr. Way recommended, "[w]ithout arguing for routine use, . . .that cholangiography should be employed more often during laparoscopic cholecystectomy than at present," especially when the surgeon encounters difficulties "in mobilizing the infundibulum of

---

[20]Lawrence W. Way, M.D., Lygia Stewart, M.D., Walter Gantert, M.D., Kingsway Liu, M.D., Crystine M. Lee, M.D. Karen Whang, M.D. & John G. Hunter, M.D., Annals of Surgery, *Causes & Prevention of Laparoscopic Bile Duct Injuries*, vol. 237(4), Apr. 2003, pp. 460-69.

[21]*Id*. at p. 460.

[22]*Id*.

the gallbladder or identifying the cystic duct, or when the surgeon suspects the presence of anatomic abnormalities, such as accessory or aberrant ducts."[23]

Dr. Gregg characterized what happened in Mrs. Molina's case as resulting from a limitation of technology. He explained that although laparoscopic technology has tremendous advantages to a patient, the trade-off is that the surgeon must rely on a monocular view during surgery, without the benefit of a sense of touch. He opined that Dr. McMullin and Dr. Levoyer weren't negligent because they properly retracted the gallbladder, swept the gallbladder up towards the liver, retracted the infundibulum (neck of the gallbladder) down and back to open the triangle of Calot, identified what they thought was the common bile duct, and viewed the area from multiple angles before they dissected. Although Dr. Way recommended more frequent intraoperative cholangiography, Dr. Gregg opined that intraoperative cholangiography was not indicated in Mrs. Molina's surgery because Dr. McMullin and Dr. LeVoyer followed the proper procedures for identifying the biliary structures and were certain that they had identified the cystic duct before the dissection.

In notable ways, Dr. Gregg's opinion is consistent with Dr. Skinner's authorities. For example, Dr. Greene's opinion—that "routine application of operative cholangiography following the identification of the cystic duct *may* lead to more definitive recognition of the extrahepatic biliary anatomy and *may* lessen the opportunity of injury to the system"[24]—is stated as a possibility rather than a probability or a guarantee. Dr. Flum recognized that "not all

---

[23]*Id*. at p. 467.

[24]Donald G. McQuarrie, M.D., Ph.D, Edward W. Humphrey, M.D., Ph.D., James T. Lee, M.D., Ph.D., F.A.C.S., Reoperative Gen. Surgery, (2d ed.), ch. 24, Frederick L. Green, M.D., *Reoperations after Laparoscopic Surgery: Problems & their Mgmt.*, p. 509 (emphasis added).

surgeons use [intraoperative cholangiography] consistently and many have disputed th[e] theory [of routine intraoperative cholangiography]."[25] Dr. Flum explained that "while advocates of cholangiography have speculated that more routine [intraoperative cholangiography] might reduce the rate of [common bile duct] injury, this has not been established in clinical trials,"[26] and that it is not clear that "all injuries would have been prevented had an cholangiogram been performed."[27] Dr. Fried opined that "[w]hether intraoperative cholangiography should be performed routinely is still controversial."[28]

Dr. Gregg's opinion about the necessity of using intraoperative cholangiography contradicts Dr. Skinner's opinion about the use of the procedure. I find both Dr. Skinner and Dr. Gregg to be credible witnesses. Dr. Skinner follows the school of thought that intraoperative cholangiography should be used routinely in performing laparoscopic cholecystectomy. Dr. Gregg follows the school of thought that intraoperative cholangiography should be used selectively. With credible evidence demonstrating that two schools of thought exist in regard to intraoperative cholangiography, I do not find that the standard of care requires surgeons in Texas to perform intraoperative cholangiography before dissecting the cystic duct. Consequently, I do not find that Dr. McMullin and Dr. LeVoyer breached the standard of care by not performing an

---

[25]David R. Flum, M.D., Thomas Koepssell, M.D., Patrick Heagerty, Ph.D., Mika Sinanan, M.D. & E. Patchen Dellinger, M.D., ARCH SURG, *Common Bile Duct Injury During Laparoscopic Cholecystectomy & the Use of Intraoperative Cholangiography: Adverse Outcome or Preventable Error?*, Nov. 2001, vol. 136, p.1288-89.

[26]*Id*. at p.1289.

[27]*Id*. at p.1292.

[28]Douglas W. Wilmore, M.D., F.A.C.S., ACS Surgery: Principles & Prac., ch. 52, Gerald M. Fried, M.D. & Liane S. Feldman, M.D., *Laparoscopic Cholecystectomy*, p. 765.

intraoperative cholangiogram.

The government also presented evidence contradicting Dr. Skinner's opinion that the standard of care requires the surgeon to recognize injury to the biliary structures intraoperatively and to repair the injury intraoperatively. Dr. Skinner opined that Dr. McMullin and Dr. LeVoyer would have recognized the injury to Mrs. Molina's common bile duct and common hepatic duct if they had used intraoperative cholangiography. Dr. Skinner relied on the following opinions: (1) Dr. Greene's opinion that "visualization and use of operative cholangiography will identify major ductal injuries at the time of the laparoscopic procedure;[29] (2) Dr. Keith D. Lillemoe's opinion that "[t]he gold standard for diagnosing a bile duct stricture is cholangiography;"[30] and (3) Dr. Fried's opinion that "one of the main advantages of cholangiography is that injuries can be recognized during the operation and promptly repaired."[31] I have determined that the standard of care did not require Dr. McMullin and Dr. LeVoyer to use intraoperative cholangiography. Consequently, I do not find that Dr. McMullin and Dr. LeVoyer breached the standard of care by failing to recognize Mrs. Molina's injury because they did use intraoperative cholangiography.

Dr. Skinner also suggested that the presence of bile should have alerted Dr. McMullin and Dr. LeVoyer that an injury had occurred. Dr. Skinner relied on the following opinions: (1) Dr. Lillemoe's opinion that a laparoscopic cholecystectomy should be converted to an open

---

[29]Donald G. McQuarrie, M.D., Ph.D, Edward W. Humphrey, M.D., Ph.D. & James T. Lee, M.D., Ph.D., F.A.C.S., Reoperative Gen. Surgery, (2d ed.), ch. 24, Frederick L. Green, M.D., *Reoperations after Laparoscopic Surgery: Problems & their Mgmt.*, p. 514.

[30]Keith D. Lillemoe, M.D., Adam B. Winick, Anthony N. Kalloo, *Benign Strictures*, ch. 24, p. 262.

[31]Douglas W. Wilmore, M.D., F.A.C.S., ACS Surgery: Principles & Prac., ch. 52, Gerald M. Fried, M.D. & Liane S. Feldman, M.D., *Laparoscopic Cholecystectomy*, p. 765.

technique and prompt cholangiography is imperative"[32] if the surgeon observes abnormal bile leakage; and (2) Dr. Fried's opinion that conversion to an open procedure may be indicated by bile leakage.[33] Dr. Skinner explained that the operative report for Mrs. Molina's laparoscopic cholecystectomy indicated that bile was spilled during the surgery and suggested that the surgeons should have recognized the injury from the spillage. The spillage of bile might indicate that Dr. McMullin and Dr. LeVoyer breached the standard of care if Dr. Skinner's testimony was the only evidence about the presence of bile because Dr. McMullin and Dr. LeVoyer observed bile during Mrs. Molina's cholecystectomy. But the government presented other evidence about reasons for the presence of bile other than an injury.

Dr. Gregg testified that spillage might occur if the gallbladder is perforated during surgery and that bile may drain from the gallbladder after the dissection. Dr. Gregg stated that spillage occurs in 20 to 30 percent of laparoscopic cholecystectomies. I find this testimony credible. As credible evidence, the testimony shows that the presence of bile does not necessarily indicate an injury because there are other reasons for bile spillage. Because credible evidence shows that the presence of bile does not necessarily indicate a common bile duct injury, I find that the standard of care does not require a surgeon to recognize an injury from the presence of bile. Consequently, I do not find that Dr. McMullin and Dr. LeVoyer breached the standard of care by failing to recognize Mrs. Molina's injury at the time of her surgery based on the presence of bile.

In response to Dr. Skinner's suggestion that a surgeon breaches the standard of care by

---

[32]Keith D. Lillemoe, M.D., Adam B. Winick, Anthony N. Kalloo, *Benign Strictures*, ch. 24, p. 263.

[33]Douglas W. Wilmore, M.D., F.A.C.S., ACS Surgery: Principles & Prac., ch. 52, Gerald M. Fried, M.D. & Liane S. Feldman, M.D., *Laparoscopic Cholecystectomy*, p. 768.

failing to recognize injury to the common bile duct intraoperatively, Dr. Gregg testified that most common-bile-duct injuries are not recognized at the time of the operation. In a study conducted at John Hopkins Hospital on postoperative bile duct strictures, Dr. Lillemoe reported that only 18.4% of biliary injury was discovered at the time of surgery.[34] Dr. Gregg testified about how the differences in a patient's anatomy can lead a surgeon to believe that he identified and dissected the cystic duct such that he does not recognize an injury to the common bile duct. Dr. Gregg testified that a surgeon does not breach the standard of care simply because he fails to recognize an injury at the time of surgery if the surgeon followed the proper procedures to retract the gallbladder and the infundibulum to open the triangle of Calot so he can identify the biliary structures. Dr. Gregg explained that even if a surgeon followed the proper procedures, he can misidentify the biliary structures where the patient's anatomy is aberrant. I find this testimony credible. As credible evidence, the testimony shows that aberrant anatomy can cause a surgeon to misidentify the biliary structures and cause him not to recognize an injury. Because credible evidence indicates that aberrant anatomy may prevent a surgeon from recognizing an injury, I find that the standard of care does not require a surgeon to recognize an injury intraoperatively. Consequently, I do not find that Dr. McMullin and Dr. LeVoyer breached the standard of care by failing to recognize Mrs. Molina's injury at the time of her surgery.

Dr. Gregg also disagreed with Dr. Skinner's opinion that the repair surgery should be done intraoperatively to meet the standard of care. Dr. Gregg explained that an injured common

---

[34]Keith Lillemoe, M.D., Genevieve B. Melton, M.D., John L. Cameron, M.D., Henry A. Pitt, M.D., Kurtis A. Campbell, M.D., Mark A. Talamini, M.D., Patricia A. Sauter, C.R.N.P. & Charles J. Yeo, M.D., Annals of Surgery, *Postoperative Bile Duct Strictures: Mgmt. & Outcome in the 1990s*, vol. 232, p. 432.

bile duct is repaired by surgically creating a hepatic duct anastomosis and altering the flow of bile from the liver into a small bowel.[35] Dr. Gregg stated that the repair surgery is most successful if it is done correctly the first time. To be done correctly, the surgeon must have an accurate understanding of the patient's anatomy and must plan and perform the repair surgery with precision—conditions which are likely not present at the time of the injury. Dr. Gregg testified that no medical evidence indicates that the repair surgery should be done immediately—instead, the evidence indicates that the surgery should be done within three to four days of the injury. I find this testimony credible. As credible evidence, the testimony shows that a repair surgery does not need to be done intraoperatively to be timely or successful. Because credible evidence indicates that a repair surgery does not need to be done at the time of the injury, I find that the standard of care does not require a surgeon to repair an injury intraoperatively. Consequently, I do not find that Dr. McMullin and Dr. LeVoyer breached the standard of care by failing to repair Mrs. Molina's injury intraoperatively.

Finally, the government presented evidence contradicting Dr. Skinner's opinion that the standard of care requires a designated camera operator during laparoscopic cholecystectomies. Dr. Gregg opined that standard of care requires three people to conduct a laparoscopic cholecystectomy—a surgeon to hold the graspers (to retract the gallbladder), a surgeon to hold

---

[35]A class III injury to the common bile duct is repaired using a surgical procedure called a hepatocholangiojejunostomy. During a hepatocholangiojejunostomy, "an anastomosis (communicating passage) is formed between the hepatic duct and the jejunum. The jejunum is the second part of the small intestine, continuous with the duodenum. The hepatic duct carries bile from the liver." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 3-H 2302 (Matthew Bender 2005).

the trocar,[36] and a third person to hold the laparoscope. Dr. Skinner relied on his own experience as a surgeon and on procedures discussed in *ACS Surgery: Principles and Procedures*.[37] In that book, Dr. Fried "discuss[ed] current indications and techniques for imaging and exploring in the [common bile duct]."[38] Dr. Fried described patient positioning as follows: "The patient should be positioned so as to optimize exposure of the gallbladder and to give the surgeon, the camera operator, and the assistant easy access to the patient and a clear view of the video monitor or monitors."[39] The discussion referred to two illustrations showing the positions of the surgeon, camera operator and assistant—North American positioning and European positioning.[40] Dr. Skinner testified that Dr. McMullin and Dr. LeVoyer breached the standard of care because they did not use a designated camera operator.

Notably, Dr. Fried's reference to a designated camera operator is not the gist of the discussion. Instead, Dr. Fried's discussion emphasizes the need for the "a clear view of the video

---

[36]A "trocar" is a "pointed instrument used for puncturing the wall of a cavity (as the wall of the chest), usually in order to withdraw fluid. It consists essentially of a metal tube into the hollow of which is inserted a pointed, tight-fitting metal spindle. The point of the spindle extends beyond the end of the tube and serves as the cutting or puncturing end of the instrument. When the trocar is introduced into the body cavity, the spindle is withdrawn and the fluid is discharged through the tube remaining in the cavity. The term trocar is sometimes applied to the pointed spindle alone. J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. 6-TH-TY 949 (Matthew Bender 2005).

[37]The ACS (American College of Surgeons) is "a scientific and educational association of surgeons that was founded in 1913 to improve the quality of care for the surgical patient by setting high standards for surgical education and practice." ACS website, Public Information, available at http://www.facs.org/about/corppro.html.

[38]Douglas W. Wilmore, M.D., F.A.C.S., ACS Surgery: Principles & Prac., ch. 52, Gerald M. Fried, M.D. & Liane S. Feldman, M.D., *Laparoscopic Cholecystectomy*, p. 753.

[39]*Id*. at p. 755.

[40]*Id*. at p. 756.

monitor" for the surgeon and the assistant.[41] The discussion describes how the patient can be positioned to allow easy access to the gallbladder and an unobstructed view of the video monitors. The discussion does not suggest that the described procedure is the only way to properly perform a laparoscopic cholecystectomy. Thus, I do not find the discussion persuasive. Dr. Skinner, however, also based his opinion on his personal experience in successfully performing laparoscopic cholecystectomies. If Dr. Skinner's testimony based on his experience as a surgeon was the only evidence about the requirement for a designated camera operator, the evidence might indicate that Dr. McMullin and Dr. LeVoyer breached the standard of care because they did not use a designated camera operator. Instead, Dr. McMullin held the trocar and the laparoscopic camera and Dr. LeVoyer held the graspers. The government, however, presented evidence contradicting Dr. Skinner's opinion that the standard of care requires a designated camera operator.

Dr. Gregg opined that the standard of care does not require a designated camera operator. Dr. Gregg explained that it is not unusual in a teaching environment like BAMC for the surgical resident to hold the camera in one hand and to hold the dissector in the other hand. He explained that in the teaching environment, the staff surgeon controls the procedure and the surgical resident does not dissect until the staff surgeon directs the cut so it doesn't matter whether a third person controls the camera. The staff surgeon remains in control regardless of who holds the camera. Dr. LeVoyer—who has trained surgical residents at BAMC for several years—testified likewise that BAMC doesn't use a separate person to hold the camera, but often allows a third person to hold the camera when one is present—like in the case of a medical student. He

---

[41] *Id*. at p. 755.

explained that the third person often shakes the camera such that it is not necessarily beneficial to have a designated camera operator. Dr. McMullin testified that sometimes a scrub tech or a medical student holds the camera, but that it is usually easier to hold the camera yourself because you can move the camera to see what you need to see, rather than directing the third person to move the camera. I find that these surgeons' testimony credible. Faced with controverting credible evidence, I find that the standard of care does not require a designated camera person. Consequently, I find that Dr. McMullin and Dr. LeVoyer did not breach the standard of care because a third person did not operate the camera.

## CONCLUSIONS OF LAW

Having discussed the areas of disagreement about the standard of care, I conclude that Mrs. Molina did not prove her theory of the standard of care by a preponderance of the evidence. In the absence of preponderance of the evidence proving Mrs. Molina's theory of the standard of care, I conclude that Mrs. Molina did not prove by a preponderance of the evidence that Dr. McMullin and Dr. LeVoyer breached the standard of care in performing Mrs. Molina's surgery. Because Mrs. Molina did not prove a breach, I conclude that negligence was not shown and the government is not liable. Mrs. Molina's prayer for relief as stated in her complaint is DENIED.

**SIGNED** on June 27, 2008.

Nancy Stein Nowak

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE